C.T., individually and as parent and natural guardian for H.J., a minor child, Plaintiff and Appellant,

v.

Harold G. MARTINEZ, Angela Martinez, the State of Utah by and through its agent, Department of Social Services, and John Does 1 through 5, Defendants and Appellees.

No. 900212.

Supreme Court of Utah.

Dec. 29, 1992.

David A. Wilde, Salt Lake City, for C.T.

R. Paul Van Dam, Debra J. Moore, Salt Lake City, for Department of Social Services.

STEWART, Justice:

Plaintiff appeals from a district court order dismissing her claim against the State of Utah under Rule 12(b)(6) of the Utah Rules of Civil Procedure. We affirm.

We accept as true the facts alleged in plaintiff's complaint. The Utah Department of Social Services (DSS) issued a license to Angela Martinez to provide family day-care services. Before issuing the li-

cense, DSS did not investigate whether Angela Martinez or her husband, Harold Martinez, had previous criminal convictions. Sometime prior to August 1988, Mrs. Martinez began providing day-care services for plaintiff's minor daughter, H.J. Without plaintiff's consent or knowledge, Mrs. Martinez frequently left H.J. in the care of others, including her husband, who had previously been convicted of sexual crimes against children. Mr. Martinez sexually abused and assaulted H.J. while caring for her.

Plaintiff sued Mr. Martinez for assault and intentional infliction of emotional distress and Mrs. Martinez for negligence. She amended her complaint to include a negligence claim against DSS for failing to investigate the criminal background of Mr. Martinez. Plaintiff settled her claim against Mrs. Martinez and obtained a default judgment against Mr. Martinez. DSS filed a motion to dismiss the claim against it on the ground that the State had not waived immunity from suit under Utah Code Ann. § 63–30–10(1)(c) (1987). Plaintiff appeals from the order granting that motion.

■ On appeal, plaintiff argues that DSS had and breached a duty to investigate the criminal background of Mr. Martinez before issuing a license to Mrs. Martinez. DSS contends that the existence of a duty is irrelevant because the state has not waived governmental immunity under Utah Code Ann. § 63–30–10(1)(c).[1] Although some jurisdictions choose to resolve questions of governmental immunity before determining whether the state owes a duty, *see, e.g., Andrade v. Ellefson*, 391 N.W.2d 836, 839 (Minn.1986); *Brasel v. Children's Servs. Div.*, 56 Or.App. 559, 642 P.2d 696 (1982), this Court has observed that sovereign immunity is an affirmative defense which arises conceptually after the determination of tort liability. *Ferree v. State*, 784 P.2d 149, 152–53 (Utah 1989);

*see also Rollins v. Petersen*, 813 P.2d 1156, 1162 n. 3 (Utah 1991); *see, e.g., Owens v. Garfield*, 784 P.2d 1187 (Utah 1989); *Beach v. University of Utah*, 726 P.2d 413 (Utah 1986). *But cf. Doe v. Arguelles*, 716 P.2d 279 (Utah 1985); *Little v. Utah State Div. of Family Servs.*, 667 P.2d 49 (Utah 1983). By analyzing tort liability first, we can sometimes avoid difficult decisions regarding sovereign immunity issues and "unwarranted assumptions and confusion about undecided duty problems." *Ferree*, 784 P.2d at 153.

■ Therefore, we first address whether DSS had a duty to investigate the criminal background of Mr. Martinez before licensing Mrs. Martinez. The first prerequisite of a valid negligence claim is the existence of a duty of care owed by the defendant to the plaintiff. *Rollins*, 813 P.2d at 1159; *Owens*, 784 P.2d at 1189; *Ferree*, 784 P.2d at 151; *Beach*, 726 P.2d at 415. Whether a duty exists is a question of law to be determined by the court. *Ferree*, 784 P.2d at 151.

■ The law does not impose a duty to control the conduct of another person or to warn others of that conduct unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection [from the third person].

*Restatement (Second) of Torts* § 315 (1964); *see also Owens*, 784 P.2d at 1189; *Rollins*, 813 P.2d at 1159; *Hale v. Allstate Ins. Co.*, 639 P.2d 203, 205 (Utah 1981). Plaintiff argues that family day-care licensing regulations create a special relationship between DSS and patrons of day-care facilities, requiring DSS to protect children in

---

**1.** Utah Code Ann. § 63–30–10(1)(c) provides:

(1) Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury arises out of:

. . . .

(c) the issuance, denial, suspension, or revocation of, or by the failure or refusal to issue, deny, suspend, or revoke, any permit, license, certificate, approval, order, or similar authorization.

those facilities from unreasonable exposure to harm.

This Court has recognized that a statute or regulation may create, in certain circumstances, a special relationship giving rise to a tort duty of care. *See, e.g., J.H. v. West Valley City,* 840 P.2d 115, 124–125 (Utah 1992); *Owens,* 784 P.2d at 1189–91; *Beach,* 726 P.2d at 417; *Little,* 667 P.2d at 53–54; *accord Turner v. District of Columbia,* 532 A.2d 662 (D.C.1987); *Andrade,* 391 N.W.2d 836 (Minn.1986). In *Owens,* we noted that day-care licensing regulations might form the basis for a special relationship between DSS and users of licensed day-care facilities. 784 P.2d at 1189–90. We did not resolve that issue in *Owens,* however, because the plaintiff was a child injured by an *unlicensed* day-care provider. *Id.* Thus, we now are presented with this issue for the first time.

Two courts have premised governmental liability on a duty created by day-care licensing statutes and regulations. *Andrade v. Ellefson,* 391 N.W.2d 836, 842 (Minn.1986); *Brasel v. Children's Servs. Div.,* 56 Or.App. 559, 642 P.2d 696, 699 (1982). The Minnesota Supreme Court held in *Andrade* that the state had a duty of due care that arose from comprehensive rules governing the needs and well-being of children in day-care facilities, reasoning that those rules evidenced the intent to protect a particular class of persons apart from the public at large. 391 N.W.2d at 842. Similarly, the Oregon Court of Appeals held in *Brasel* that state licensing provisions create a duty of due care to users of day-care facilities because users are members of the class protected by those provisions. 642 P.2d at 696.[2]

Utah's day-care licensing provisions are similar to those reviewed in *Andrade* and *Brasel.* DSS licenses day-care providers under the authority of Utah Code Ann. §§ 62A–2–101 to –116. Section 62A–2–104 establishes a Human Services Licensing Committee with authority under § 62A–2–105(1), (2) to promulgate licensing standards and establish rules for approving, denying, suspending, and revoking licenses for social service programs and facilities, including day-care services. DSS has promulgated detailed regulations on the requirements and procedures for licensure. Utah Admin.R. 815–4–1 to –12 (1987).[3] These regulations set minimum qualifications for caregivers and minimum health and safety standards for facilities.[4] Before issuing a license, DSS must inspect the home to ensure compliance with health and safety standards, obtain written references from persons acquainted with the applicant, and check for pending abuse or neglect charges against the applicant. Utah Admin.R. 815–4–12. The purpose of these licensing standards and procedures is to "set a minimum level of care which must be maintained by caregivers to assure the health, safety, welfare and education of children." Utah Admin.R. 815–4–1(A), –12(A). As in *Andrade* and *Brasel,* these licensing provisions protect children in licensed day-care facilities, not the public at large.

Because the licensing provisions were intended to protect patrons of licensed day-care facilities, a special relationship exists

**2.** In Rhode Island, the state supreme court held that an allegation of negligence in *licensing* a day-care facility is not actionable, although an allegation of negligence in *supervising* a particular day-care facility is actionable where the state is aware that an identifiable individual or member of an identifiable group is at risk of harm. *Gagnon v. State,* 570 A.2d 656, 659 (R.I.1990). *But cf. Jamierson v. Dale,* 670 S.W.2d 197 (Mo. Ct.App.1984) (a day-care inspector's duty is to her employer, the State of Missouri, not to the children in day-care facilities).

**3.** These regulations have since been renumbered to Utah Admin.R. 501–9–1 to –11 (1992). Because the cause of action arose in 1987, all cites to the licensing regulations are to the 1987 Administrative Code.

**4.** The regulations require, among other things, that caregivers be at least 18 years of age, be able to handle emergencies, and undergo a tuberculin skin test and a physical examination for communicable diseases. Utah Admin.R. 815–4–2(A).

Safety regulations require an approved smoke detector and a fire extinguisher for each floor occupied by children, R. 815–4–10(4), covered electrical outlets, and hazardous materials kept out of reach, R. 815–4–11(B). The regulations also set minimum nutritional standards. R. 815–4–7.

between DSS and those patrons. As a member of the protected class, H.J. was entitled to expect that DSS would enforce the mandatory licensing provisions.

■ Plaintiff's claim must nevertheless fail because the duty imposed on DSS by the day-care licensing regulations does not include investigating the criminal background of every member of an applicant's household. When a statute or regulation creates a special relationship, we look to the applicable provisions giving rise to a duty of care for guidance in determining the scope of the duty imposed. The statutory and regulatory requirements in effect at the time of Mrs. Martinez's licensure did not require DSS to check the criminal record of caregivers or their spouses prior to licensure.

Plaintiff asserts that Rule 815–4–1(C)(5) imposes a duty on DSS to investigate the criminal background of all members of an applicant's household. That rule provides, "If any person living in the home has a criminal record, a license may be denied or revoked." Utah Admin.R. 815–4–1(C)(5) (1987). This rule, however, must be read in light of the Family Day Care Licensing Policy, which sets forth procedures for licensing caregivers. Utah Admin.R. 815–4–12.

Rule 815–4–12(G)(1) states that before issuing a license, DSS must check the Central Register for possible abuse or neglect charges against the potential caregiver.[5] The Licensing Policy does not, however, require DSS to investigate the criminal record of the caregiver or spouse in all situations. Rule 815–4–12(G)(2) (1987) provides:

> If there is any evidence or reason to believe that the caregiver or any person

working or living in the facility would be harmful to children, the person's criminal record, as well as the Central Register for Child Abuse, may be reviewed and clearance required before licensure. An individual may be asked to obtain a letter of certification indicating they have no criminal record.

This provision does not require DSS to investigate the criminal record of a member of a caregiver's household unless DSS has some "reason to believe" that person might be harmful to children. Indeed, rather than mandating the investigation of each household member's criminal record, this rule only authorizes the investigation of a household member's criminal record when there is a reasonable basis for doing so. In this case, plaintiff has not alleged that DSS suspected or had any reason to believe that Mr. Martinez posed a risk of harm to children. Hence, plaintiff's claim falls outside the statutorily based duty owed by DSS.

In the absence of a statutory or regulatory mandate, we are reluctant to impose on DSS the duty and burden to investigate the criminal background of each household member. Imposing such a duty would force DSS to allocate limited resources to investigate the criminal background of non-caregivers, even though the resources could be allocated in ways that better serve day-care patrons. This policy decision is for the Legislature and the agency entrusted with promulgating licensing standards to make.[6]

Affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM, J., concur.

---

**5.** Rule 815–4–12(G)(1) states in full:
   Before licensure and annually thereafter caregivers shall be checked in the Central Register for possible abuse/neglect charges or any pending investigation. Caregivers that have protective service interventions open or reports on the register shall be investigated to assure they would not be harmful to children. "Abuse and neglect" means causing harm or threatened harm to a child's health or welfare. (UCA 78–3b–2).

**6.** As of July 1, 1990, an applicant must submit identifying information to DSS, including fin-

gerprints of all care providers to obtain or renew a day-care license. This information is processed through the Bureau of Criminal Identification to determine whether a care provider has been convicted of a crime. Utah Code Ann. § 62A–4–514 (Supp.1990).

   Presumably, this statute applies to anyone residing in the facility who might assist the caregiver in providing day-care services. However, because this provision was enacted after plaintiff's cause of action arose, we do not determine what impact, if any, this statute might have on the facts before us.

**ZIMMERMAN, Justice (concurring):**

I concur in the opinion of Justice Stewart. Under the facts presented, no duty was owed to plaintiffs. I understand the court's proceeding to the duty issue first. However, I would proceed to observe that the district court properly ruled that the Department of Social Services was immune because the claim of harm asserted "arises out of the issuance ... or ... failure ... [to] deny, suspend, or revoke, any permit, license, certificate, approval, order, or similar authorization." Utah Code Ann. § 63–30–10(1)(c) (1989) (amended 1989). That much was settled by *Gillman v. Department of Financial Institutions*, 782 P.2d 506, 511 (Utah 1989). No purpose is served by not reaffirming that point for the bench and bar, although I concede it might be dictum.